## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

THE UNITED STATES OF AMERICA *ex rel.*  )
LA-WANDA M. DAVIS, TRAMECIER J.        )
DONALD, and MEGAN DINKINS,             )
                                        )
       Plaintiffs,                    )
                                        )
    v.                                 )   Civil Action No.
                                        )
SOUTHERN SNF MANAGEMENT, INC.,         )   **FILED IN CAMERA AND UNDER**
REHAB SERVICES IN MOTION, LLC,         )   **SEAL IN ACCORDANCE WITH THE**
EASTERN SHORE REHABILITATION &         )   **FALSE CLAIMS ACT, 31 U.S.C. §**
HEALTH CENTER, SE HEALTHCARE,          )   **3730(b)(2)**
INC., ARBOR TRAIL REHABILITATION &     )
SKILLED NURSING CENTER, TERRACES       )   **DO NOT PLACE IN PRESS BOX**
OF LAKE WORTH REHABILITATION &         )
NURSING CENTER, SOUTHERN OAKS          )   JURY TRIAL DEMANDED
REHABILITATION & NURSING CENTER,       )
SHORE ACRES REHABILITATION &           )
HEALTH CENTER, WOODBRIDGE              )
REHABILITATION & HEALTH CENTER,        )
PARKLANDS REHABILITATION &             )
NURSING CENTER, PALMETTO               )
REHABILITATION & HEALTH CENTER,        )
PALMS REHABILITATION & HEALTH          )
CENTER, WILLISTON REHABILITATION       )
& NURSING CENTER, NORTH CAMPUS         )
REHABILITATION & HEALTH CENTER,        )
NORTH LAKE REHABILITATION &            )
HEALTH CENTER, MADISON POINTE          )
REHABILITATION & HEALTH CENTER,        )
GULF SHORE REHABILITATION &            )
NURSING CENTER, EXCEL                  )
REHABILITATION & HEALTH CENTER,        )
ADVANCED REHABILITATION &              )
HEALTH CENTER, BAYSIDE                 )
REHABILITATION & HEALTH CENTER         )
and COURTYARD GARDENS                  )
REHABILITATION CENTER,                 )
                                        )
       Defendants.                    )

## **COMPLAINT**

1.      Plaintiff Relators La-Wanda Davis, Tramecier Donald and Megan Dinkins ("Relators") bring this False Claims Act ("FCA") action against Southern SNF Management, Inc. ("Southern SNF"), Rehab Services In Motion, LLC ("Dynamic Rehab"), Eastern Shore Rehabilitation & Health Center ("Eastern Shore" or the "Center"), SE Healthcare Inc., ("SE Healthcare"), Arbor Trail Rehabilitation & Skilled Nursing Center, Terraces Of Lake Worth Rehabilitation & Nursing Center, Southern Oaks Rehabilitation & Nursing Center, Shore Acres Rehabilitation & Health Center, Woodbridge Rehabilitation & Health Center, Parklands Rehabilitation & Nursing Center, Palmetto Rehabilitation & Health Center, Palms Rehabilitation & Health Center, Williston Rehabilitation & Nursing Center, North Campus Rehabilitation & Health Center, North Lake Rehabilitation & Health Center, Madison Pointe Rehabilitation & Health Center, Gulf Shore Rehabilitation & Nursing Center, Excel Rehabilitation & Health Center, Advanced Rehabilitation & Health Center, Bayside Rehabilitation & Health Center and Courtyard Gardens Rehabilitation Center (collectively, "Defendants") to recover many thousands, and more likely millions, of dollars that Defendants have caused the federal health care programs, including Medicare and TRICARE, to pay for skilled rehabilitation therapy services that were not covered by the skilled nursing facility benefit, that were not medically reasonable and necessary, that were not beneficial, and that in multiple instances resulted in physical harm to the patient or even death.

2.      Medicare Part A pays skilled nursing facilities a daily rate to provide skilled nursing and skilled rehabilitation therapy services to qualifying Medicare patients ("beneficiaries" or "patients"). The daily rate that Medicare pays a nursing facility depends heavily on the rehabilitation needs of the beneficiaries. The highest daily rate that Medicare will pay a nursing facility is reserved for those beneficiaries that require "Ultra High" levels of

skilled rehabilitation therapy, or a minimum of 720 minutes per week of skilled therapy from at least two therapy disciplines (*i.e.*, physical, occupational, or speech). The Ultra High therapy level is intended for the most clinically complex patients who require skilled rehabilitative therapy well beyond the average amount of service time. TRICARE pays nursing facilities using the same system as Medicare.

3.     Since the beginning of 2012, and continuing to the present, the Defendants have been engaged in a systemic scheme throughout the Southern SNF chain of skilled nursing facilities to fraudulently maximize the number of days billed to Medicare Part A and TRICARE at the Ultra High level. Specifically, Defendants have instituted and executed a companywide policy of assigning Medicare Part A and TRICARE patients to an Ultra High level of skilled therapy regardless of whether the type, the frequency or the duration of the therapy assigned to these patients bears any relationship to the patients' individual needs or actual diagnoses. Execution of this unlawful policy has included Defendants' 1) utilization and preparation of patient care plans that are not related to the beneficiaries' individual needs and actual diagnoses, 2) administration of therapies that offer and provide no benefit and are of excessive duration and frequency, and 3) infliction of harm to the patients. This scheme has been immensely successful. By way of example, during the fourteen month period running from January 1, 2012 through March 8, 2013, roughly two-thirds of Eastern Shore's Medicare Part A patient days were billed at the Ultra High level. Ultimately, through this scheme, the Defendants have fraudulently inflated their claims for payment submitted to Medicare and TRICARE and thereby wrongfully appropriated for themselves federal taxpayer funds to which they are not legally entitled.

4.     Because Defendants knowingly presented and caused to be presented false claims to the Medicare and TRICARE programs for non-beneficial and, at times, harmful therapy

services, and used false records and statements to support those false claims, the Relators bring

this action to recover treble damages and civil penalties under the FCA, 31 U.S.C. §§ 3729, *et*

*seq.*

## I.  <u>JURISDICTION AND VENUE</u>

5.     This Court has jurisdiction under 31 U.S.C. § 3730 and 28 U.S.C. §§ 1331 and

1345. The Court may exercise personal jurisdiction over Defendants because one of the

Defendants resides and/or transacts business in this District or committed the proscribed acts in

this District. Venue lies in this District pursuant to 31 U.S.C. § 3732(a), in that many of the acts

complained of took place in this District and Eastern Shore Rehabilitation & Health Center is

located in this District.

## II.  <u>PARTIES</u>

6.     The United States of America is a Plaintiff to this action. The United States brings

this action on behalf of (a) the Department of Health and Human Services ("HHS") and the

Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare and

Medicaid programs, and (b) the Department of Defense, including its component, TRICARE.

7.     Relator La-Wanda M. Davis, a resident of Alabama, received her Master's degree

in Speech-Language Pathology from Tennessee State University and her undergraduate degree

from the University of Southern Mississippi. She holds a license to practice in Alabama, Florida

and Georgia as well as a national Certificate of Clinical Competency from The American Speech

and Hearing Association. Ms. Davis has fourteen years of work experience practicing as a

speech-language therapist, seven of which have been at skilled nursing facilities. Ms. Davis

joined Mercy Medical (the predecessor to Eastern Shore, as described herein) as a speech-

language therapist on or about June 30, 2011. She was terminated on or about February 20, 2013

in retaliation for voicing concerns about unlawful practices taking place at Eastern Shore that are alleged herein.

8.      Relator Tramecier J. Donald, a resident of Daphne, Alabama, received an Associate's degree in science as an occupational therapy assistant at Wallace State Community College in Hanceville, Alabama. She was subsequently awarded a Bachelor's of Science degree in business management from Huntington College in Montgomery, Alabama. Ms. Donald began her employment at Mercy Medical on or about March 15, 2011 as a Certified Occupational Therapy Assistant and remained employed at the facility after it was acquired by SE Healthcare in late 2011 and later renamed Eastern Shore. She is still employed at Eastern Shore. Ms. Donald is also licensed as an assisted living/specialty care administrator.

9.      Relator Megan Dinkins, a resident of Mobile, Alabama, received her Bachelor's degree in speech and hearing therapy sciences from the University of Southern Alabama and was awarded a Master's degree in occupational therapy from the same institution. Her first job post-graduation was with Eastern Shore, where she began employment as an occupational therapist on or about January 29, 2012. Ms. Dinkins left the employ of Eastern Shore on or about April 5, 2013. She is currently employed at Restore Therapy Services located in Mobile, Alabama.

10.     Defendant Southern SNF Management, Inc. is a privately held health care management company with its main offices at 2870 Stirling Road, Ste. 101a, Hollywood, Florida. It was incorporated in Florida in 2007. Southern SNF operates a chain of skilled nursing facilities, including Eastern Shore, located in Florida and Alabama. These facilities include the following, each of which is named as a defendant herein:

   a.      Advanced Rehabilitation & Health Center – 401 Fairwood Avenue, Clearwater, FL 33759

b.      Arbor Trail Rehabilitation & Skilled Nursing Center – 611 East Turner Camp Road, Inverness, FL 34453

c.      Bayside Rehabilitation & Health Center – 811 Jackson Street N, St. Petersburg, FL, 33705

d.      Courtyard Gardens Rehabilitation Center – 17781 Thelma Avenue, Jupiter, FL 33458

e.      Eastern Shore Rehabilitation & Health Center – 101 Villa Drive, Daphne, AL 36526

f.      Excel Rehabilitation & Health Center – 2811 Campus Hill Drive, Tampa, FL 33612

g.      Gulf Shore Rehabilitation & Nursing Center – 6767 86th Avenue, Pinellas Park, FL 33782

h.      Madison Pointe Rehabilitation & Health Center – 6020 Indiana Avenue, New Port Richey, FL 34653

i.      North Campus Rehabilitation & Health Center – 700 North Palmetto Street, Leesburg, FL 34748

j.      North Lake Rehabilitation & Health Center – 750 Bayberry Drive, West Palm Beach, FL 33403

k.      Palmetto Rehabilitation & Health Center – 6750 W 22nd Court, Hialeah, FL 33016

l.      Palms Rehabilitation & Health Center – 3370 NW 47th Terrace, Lauderdale Lakes, FL 33319

m.      Parklands Rehabilitation & Health Center – 1000 SW 16th Avenue, Gainesville, FL 32601

n.      Shore Acres Rehabilitation & Health Center – 4500 Indianapolis Street NE, St. Petersburg, FL 33703

o.      Southern Oaks Rehabilitation & Nursing Center – 600 West Gregory Street, Pensacola, FL 32502

p.      Terraces of Lake Worth Rehabilitation & Nursing Center – 1711 6th Avenue South, Lake Worth, FL 33460

q.      Williston Rehabilitation & Nursing Center – 300 NW 1st Avenue, Williston, FL 32696

r.      Woodbridge Rehabilitation & Health Center – 8720 Jackson Springs Road, Tampa, FL 33615

Throughout the relevant time period, each of these facilities provided skilled therapy to Medicare Part A beneficiaries and continues to do so today. Skilled therapy operations have been managed by Dynamic Rehab at each of these facilities at all relevant times.

11.     Defendant Eastern Shore Rehabilitation & Health Center is a not for profit skilled nursing and rehabilitation center located at 101 Villa Drive, Daphne, Alabama, where it provides services to Medicare, TRICARE, private pay and Medicaid patients.

12.     Defendant Rehab Services In Motion, LLC, which does business under the name Dynamic Rehab, provides rehabilitation services, including skilled physical, occupational and speech-language therapies, to Southern SNF's facilities. According to Dun & Bradstreet, its headquarters are located at 368 New Hempstead Road, New City, New York. It was incorporated in 2006 and is privately held. According to Southern SNF's own documents, Dynamic Rehab and Southern SNF share office space in Hollywood, Florida.

13.     SE Healthcare, Inc. ("SE Healthcare") is a not for profit corporation incorporated in Alabama in September 2011. In or around November 2011, SE Healthcare acquired Mercy Medical hospital located in Daphne, Alabama for $9.4 million.

### III.  THE FALSE CLAIMS ACT

14.     The FCA provides, in pertinent part, that any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim…

* * *

7

is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1)-(2) (2006), as amended by 31 U.S.C. § 3729(a)(1)(A)-(B) (2010).

15.    The FCA further provides that "knowing" and "knowingly"

(A)    mean that a person, with respect to information-

(i)    has actual knowledge of the information;
(ii)   acts in deliberate ignorance of the truth or falsity of the information; or
(iii)  acts in reckless disregard of the truth or falsity of the information; and

(B)    requires no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1) (2010).

16.    Section 3729(a)(1) of the FCA provides that a person is liable to the United States for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## IV.  THE MEDICARE PROGRAM

### A.    Medicare Coverage Of Skilled Nursing Facility Rehabilitation Therapy

17.    Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426 & 426A.

18.    The Medicare program is divided into four "parts" that cover different services.

Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

19.     Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying inpatient hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §409.61(b)-(c). After the first 20 days, however, a co-payment of twenty percent (20%) is required of the patient.

20.     The conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit include: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

21.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility and to re-certify to the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare Gen. Info., Eligibility, & Entitlement Manual, ch. 4, § 40.3.

22.     To be considered a *skilled* service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech

pathologists. *See* 42 C.F.R. § 409.31(a).

23.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitious exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d). "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; *e.g.*, aides or nursing personnel ...." Medicare Benefit Policy Manual, ch. 8, § 30.4.1.1.

24.     Medicare Part A will only cover those services that are reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary); 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).

25.     In the context of skilled rehabilitation therapy, this means that the services furnished: 1) must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; 2) must be consistent with accepted standards of medical practice; and 3) must be reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, ch. 8, § 30.

26.     In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that: "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such

provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. § 1395l(e).

27.     To be covered by Medicare, services must not only be medically necessary, they must also be provided in the most economical manner. This economical manner requirement is set forth in multiple federal statutes and CMS regulations prescribing the responsibilities and obligations of health care practitioners, providers of health care services (including hospitals), and contractors who review claims for payment.

28.     Practitioners and providers are obligated to assure that the services:

(1)     will be provided economically and only when, and to the extent, medically necessary;

(2)     will be of a quality which meets professionally recognized standards of health care; and

(3)     will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing quality improvement organization in the exercise of its duties and responsibilities.

42 U.S.C. § 1320c-5(a).

**B.     Medicare Payment For Skilled Nursing Facility Rehabilitation Therapy**

29.     Under its prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998). The amount paid depends on the resource needs of the residents. Residents with heavy care needs require more staff resources and payment levels are thus higher than for those residents with fewer needs.

30.     The daily PPS rate that Medicare pays a nursing facility depends, in large part, on the Resource Utilization Group ("RUG") to which a patient is assigned. Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation

services to beneficiaries with similar characteristics or resource needs. Since October 1, 2010, Medicare has utilized the RUG-IV classification system pursuant to which there are 66 RUG levels.

31.     The Minimum Data Set ("MDS") is a document periodically completed by the nursing facility for each patient and includes detailed assessments of the patients' clinical condition, functional status and use of services. The MDS is the document Medicare uses to determine a patient's level in the RUG hierarchy. Residents with more specialized nursing requirements, those receiving licensed therapies or those with greater need for daily activities assistance according to their MDS are assigned to a higher level of the RUG hierarchy.

32.     There are generally five rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

33.     The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes a patient received, the number of days per week the therapy was received and the number of therapy disciplines the patient received during a seven-day assessment period (known as the "look back period"). The chart below reflects the requirements for the five rehabilitation RUG levels under the RUG-IV classification system.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra high | minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week |
| RV = Very high | minimum 500 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RH = High | minimum 325 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RM = Medium | minimum 150 minutes per week total therapy; must be provided at least 5 days per week but can be any mix of therapy disciplines |
| RL = Low | minimum 45 minutes per week total therapy; must be provided at least 3 days per week but can be any mix of therapy disciplines |

63 Fed. Reg. at 26,262.

34.     Medicare pays the most for those beneficiaries that fall into the Ultra High RUG level. The Ultra High RUG level (RU) is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998).

35.     In addition to reflecting a patient's rehabilitation therapy needs, each RUG also reflects the patient's ability to perform certain activities of daily living ("ADL"), like eating, toileting, bed mobility and transfers (*e.g.*, from a bed to a chair). A patient's ADL score (ranging from A to C) reflects his or her dependency level when performing an ADL. A very dependent patient who cannot perform any of the ADLs without assistance would generally receive an ADL score of "C," while a patient who could perform the ADLs without assistance would receive an ADL score of "A".

36.     To demonstrate the significant impact that the RUG level, and in particular the *rehabilitation* RUG level, has on the Medicare daily rate, provided below is a summary chart reflecting adjusted rates that Medicare pays nursing facilities located within rural Alabama (such as Eastern Shore) for rehabilitation beneficiaries. These rates went into effect starting October 1,

13

2011 and remain in effect presently. Medicare adjusts base rates annually and based on locality.
*See* 42 U.S.C. § 1395yy(e)(4)(E)(ii)(IV).

**DAILY RUG RATES: FEDERAL RATES FOR FY 2012 FOR RURAL ALABAMA**
**Activities Daily Level**

| RUG Level | A | B | C |
|---|---|---|---|
| **RU** (ultra high rehab) | $ 402.89 | $ 473.89 | $ 473.89 |
| **RV** (very high rehab) | $ 349.77 | $ 351.01 | $ 400.84 |
| **RH** (high rehab) | $ 277.40 | $ 312.28 | $ 344.68 |
| **RM** (medium rehab) | $ 234.71 | $ 282.04 | $ 299.49 |
| **RL** (low rehab) | $ 187.94 | $ 286.35 | |

**C.    Statements And Claims To Medicare For Payment Of Skilled Nursing Facility Rehabilitation Therapy**

37.    Medicare requires nursing facilities periodically to assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments on the MDS.

38.    In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility. The date on which the facility performs the assessment is known as the Assessment Reference Date. A nursing facility may generally perform the skilled rehabilitative therapy assessment within a window of time before this date or, under certain circumstances, up to five days after. When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the Assessment Reference Date. As discussed above, this seven day assessment period is referred to as the "look-back period."

39.    The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section O of the MDS ("Special Treatments, Procedures and Programs") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during

the look-back period. In particular, Section O shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (*i.e.,* physical therapy, occupational therapy, and speech-language pathology and audiology services).

40.    In most instances, the RUG level determines Medicare payment prospectively for a defined period of time. *See* 63 Fed. Reg. at 26,267.[1] For example, if a patient is assessed on day 14 of his stay and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility will be paid for the patient at the Ultra High RUG level (RU) for days 15 through 30 of the patient's stay.

41.    The software CMS provides to the healthcare provider to encode and transmit the MDS assessment data (which goes directly to CMS, *see* 42 C.F.R. § 483.20(f)(3)) calculates the RUG-IV level based on the MDS data supplied. CMS then reviews and validates the assigned RUG-IV level.

42.    Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265. Further, skilled nursing facilities must use the RUG-IV level that the CMS software has calculated, and that CMS has then validated, when bills are submitted for payment. The MDS itself requires an express certification on behalf of the provider that states:

> I certify that the accompanying information accurately reflects resident assessment information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I

---

[1] Payment for days one through fourteen is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day fourteen. *See* 63 Fed. Reg. at 26,265-67; 64 Fed. Reg. at 41,662.

also certify that I am authorized to submit this information by this facility on its behalf.

MDS – Ver. 3.0 for Nursing Home Resident Assessment and Care Screening.

43.     A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included in Form CMS-1450, which nursing facilities submit electronically to Medicare for payment. Medicare Claims Processing Manual, ch. 25, § 75.5. Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of Form CMS-1450. *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, ch. 25 § 75.5.

44.     Skilled nursing facilities submit Form CMS-1450 electronically under Medicare Part A to Medicare payment processors known as Medicare Administrative Contractors ("MACs"), formerly known as Fiscal Intermediaries ("FIs"). MACs process and pay Medicare claims.

## V.  TRICARE

45.     TRICARE (formerly CHAMPUS) is a federally funded medical benefit program established by statute. *See* 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, who include, among others, active duty service members, retired service members, and their dependents.

46.     TRICARE covers the same skilled nursing services as Medicare. The regulatory authority implementing the TRICARE program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies. *See* 10 U.S.C. §§1079(j)(2) (institutional providers).

47.     TRICARE, like Medicare, pays only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).

48.     TRICARE follows Medicare's PPS and RUG methodology and assessment schedule, and beneficiaries are assessed using the same MDS form used by Medicare. *See* TRICARE Reimbursement Manual 6010.58M, ch. 8, § 2, 4.3.5-4.3.7, 4.4.3.

## VI.  MEDICAID

49.     Medicaid is a government health insurance program for the poor (the "Medicaid Program") that is jointly funded by the federal and state governments. *See* 42 U.S.C. §§ 1396, *et seq*. Each state administers its own Medicaid program. However, each state program is also governed by federal statutes, regulations and guidelines. The federal portion of each state's Medicaid payment – the Federal Medical Assistance Percentage – is based on that state's per capita income compared to the national average. During the relevant time period, the Federal Medical Assistance Percentage has been between approximately 50% and 80%.

## VII.  FACTUAL ALLEGATIONS

**A.     Background Regarding The Defendants**

50.     In or around November 2011, SE Healthcare acquired Mercy Medical, a skilled nursing facility in Daphne, Alabama. According to a news report at the time, the facility was to be managed by Southern SNF Management, Inc. In or around January of 2012, Southern SNF and/or SE Healthcare renamed the facility Eastern Shore Rehabilitation & Health Center.

51.     Eastern Shore has approximately 106 beds. It accepts Medicare, Medicaid, TRICARE and private pay patients. Approximately 60 of these beds are occupied by long term care patients who are generally covered by Medicaid. When members of this subset of patients are prescribed skilled therapy, roughly 85% have Medicare Part B coverage. Generally, five or

fewer Medicaid patients are receiving skilled therapy at any given time. The remaining patients, generally 35 to 46, are skilled care patients, most of whom are covered by Medicare Part A but sometimes by TRICARE. Roughly 90% of Eastern Shore's patients come from local hospitals.

52.     Eastern Shore occupies three floors of its four floor building. Mobile Bay Rehab Hospital ("Mobile Bay"), which provides short term rehabilitative therapy services, occupies the remaining floor. Relators believe that SE Healthcare acquired Mobile Bay at or around the same time it acquired Mercy Medical. In or around late 2012 or early 2013, it contracted with Dynamic Rehab to manage Mobile Bay's operations.

53.     Throughout the relevant time period, Kelley Urban has held the position of administrator of Eastern Shore and Mobile Bay. She previously held the position of administrator at Mercy Medical. Also throughout the relevant time period, until approximately the first half of March 2013, Denice Stabler (referred to herein as "Stabler" or the "Rehab Manager") was employed by Dynamic Rehab and held the position of Rehab Manager at Eastern Shore. As such, she had primary responsibility within the facility for preparing plans of care for the skilled therapy patients and overseeing the provision of skilled therapy. Stabler is a licensed physical therapy assistant. Stabler was terminated from her employment on or about February 26, 2013 and has been replaced by Tricia Dubose. The fraudulent activities have continued since Stabler's departure. Sandy Faronda has been the Regional Director of Dynamic Rehab at all relevant times and as such is responsible for the provision of skilled therapy at numerous Southern SNF facilities. Right after Mercy Medical was acquired and renamed in late 2011 and Southern SNF had assumed responsibility for managing it, Faronda began to visit Eastern Shore on a regular basis, generally weekly, to make certain that skilled therapy was being prescribed and

administered in accordance with Dynamic Rehab requirements. After several months of coming weekly, her visits became monthly.

54.     Throughout the relevant time period, Michael Bokor has been the Chief Executive Officer of Southern SNF. During Relator Davis's tenure at Eastern Shore, Bokor visited Eastern Shore approximately five times. James Kessler is the Chief Operating Officer of Southern SNF. Since the beginning of its operations in or around January 2012, Kessler has visited the facility on a regular basis. For the first couple of months, he generally visited weekly. Thereafter, he began to visit the Center one or two times per calendar quarter. The relationship between Southern SNF and Dynamic Rehab as well as some other entities, such as Platinum, Apex Healthcare and Global, was at times unclear. Once when asked whether the Eastern Shore skilled therapy personnel worked for Southern SNF or Dynamic Rehab, Leslie Crenshaw, the head of human resources replied, "Honey, your guess is as good as mine[.]"

**B.      The Policy At Eastern Shore And The Entire Southern SNF Chain Of Skilled Nursing Facilities Is To Assign Medicare Part A Patients To An Ultra High Level Of Skilled Therapy Regardless Of Their Diagnosis, Their Physical Condition Or Their Physical Or Cognitive Limitations**

55.     The core of Defendants' fraud is to assign most, or almost all, Medicare Part A patients to the Ultra High RUG level of skilled therapy at any cost, regardless of their physical needs, physical or cognitive condition, or diagnosis. This unlawful policy has manifested itself in multiple ways throughout Eastern Shore and the entire Southern SNF chain of skilled nursing facilities.

56.     The groundwork for Defendants' Ultra High policy was laid on the first day that Southern SNF assumed control of Eastern Shore, on or about December 11, 2011. On that day, COO James Kessler assembled at the facility all skilled therapists (speech, occupational and physical), all administrative personnel and all supervisory personnel, including Denice Stabler.

He proceeded to announce to this audience that all Medicare Part A patients have the right to get skilled therapy. He made it clear that under Southern SNF, there would be no discretion on the part of the skilled therapists themselves as to what type, frequency or duration of therapy would be prescribed for a Medicare Part A patient. On or about January 3, 2012, Maribel Vega, Director of Compliance at Dynamic Rehab, came to the Center and trained the skilled therapists on how to complete the new forms which they would henceforth be using to record their skilled therapy sessions with patients.

57.     An individualized treatment care plan is legally required for both Medicare and Medicaid nursing home patients pursuant to the Nursing Home Reform Act of 1987. *See* 42 U.S.C. § 1395i-3. A treatment care plan is a set of short term and long term goals that address patient impairments to improve a patient's ability to return to their prior level of function. The goals must be measurable, clearly related to the impairments identified and specific such that another similarly trained clinician can follow the plan.

58.     Denice Stabler had primary responsibility for creating the treatment care plan for each Medicare Part A patient. Generally, when a new Medicare Part A patient entered the facility, Stabler would devise a care plan that included a program of skilled therapy that would place the patient at the Ultra High level of therapy. This usually meant that each new Medicare Part A patient was assigned all three types of therapy, or else extremely long sessions of physical and occupational therapies, on a daily basis upon admission, regardless of whether this regimen was medically indicated or not. Indeed, on or about June 28, 2012, Stabler verbally acknowledged to Relator Davis and Relator Dinkins that, when a new Medicare Part A patient is admitted, she seeks to "pre-plan [skilled therapy] minutes from day 1 to day 100 on Ultra-High" even though she knows little or nothing about the patient. Tellingly, treating therapists were not

permitted to attend the meetings with patients' families during which the care plan was discussed. Sometimes, one of the physical therapists would rewrite goals within the care plan in order to render them unattainable, thus helping to ensure that continuing the program of therapy would appear warranted. The physicians responsible for approving these care plans (five physicians have been responsible for signing-off on the care plans of virtually all patients) routinely neglected to sign-off on them within 30 days, and often fell behind by many months.

59.     The pressure to maintain Medicare Part A patients at the Ultra High level emanated directly from Southern SNF Management. In January 2013, Relator Davis learned that Stabler was upset because the Center had an insufficient number of skilled therapists. In response, Relator Davis suggested that Stabler examine the patient list and ramp down some Medicare Part A patients from the Ultra High therapy level – for instance, patients who had been at Ultra High for 45 days or more. Stabler reacted by saying that she could not do that because, if she did not maintain at least 70% of the patient caseload at the Ultra High level, she would "get a nasty phone call from Sandy [Faronda]."

60.     The Ultra High level policy also manifested itself when the Defendants submitted the MDS assessment that was periodically prepared for each Medicare Part A patient. The chart below provides a sampling of the information provided in Section O of the MDS assessment forms completed periodically for a representative group of approximately 322 total patients admitted to Eastern Shore during the 2012 timeframe:

| MRN | ARD Date | RUG | Assessment | ST Start Date | S Mins | OT Start Date | O Mins | PT Start Date | P Mins | Total Mins |
|---|---|---|---|---|---|---|---|---|---|---|
| 21156 | 2/18/2012 | RU | 5 day | | | 2/13/2012 | 375 | 2/13/2012 | 350 | 725 |
| 21156 | 2/24/2012 | RU | 14 day | | | 2/13/2012 | 385 | 2/13/2012 | 340 | 725 |
| 21156 | 3/2/2012 | RM | Discharge Assessment | | | 2/13-3/1/12 | 290 | 2/13-3/1/12 | 315 | 605 |
| 21157 | 2/20/2012 | RU | 5 day | | | 2/14/2012 | 350 | 2/14/2012 | 370 | 720 |
| 21157 | 2/26/2012 | RV | 14 day | | | 2/14/2012 | 395 | 2/14/2012 | 110 | 505 |
| 21157 | 3/11/2012 | RU | 30 day | | | 2/14/2012 | 345 | 2/14/2012 | 375 | 720 |
| 21157 | 4/15/2012 | RV | 60 day | | | 2/14-4/14/12 | 235 | 2/14/2012 | 275 | 510 |
| 21158 | 2/20/2012 | RU | 5 day | | | 2/14/2012 | 377 | 2/24/2012 | 345 | 722 |
| 21158 | 2/22/2012 | RV | Discharge Assessment | | | 2/14-2/22/12 | 330 | 2/14-2/22/12 | 235 | 565 |
| 21159 | 2/20/2012 | RU | 5 day | 2/20/2012 | 30 | 2/14/2012 | 295 | 2/14/2012 | 426 | 751 |
| 21159 | 2/26/2012 | RU | 14 day | 2/20/2012 | 210 | 2/14/2012 | 230 | 2/14/2012 | 290 | 730 |
| 21159 | 3/1/2012 | RU | Discharge Assessment | 2/20-3/1/12 | 205 | 2/14-3/1/12 | 250 | 2/14-3/1/12 | 309 | 764 |
| 21160 | 2/23/2012 | RU | 5 day | | | 2/17/2012 | 355 | 2/17/2012 | 365 | 720 |
| 21160 | 2/29/2012 | RU | 14 day | | | 2/17/2012 | 365 | 2/17/2012 | 355 | 720 |

Attached hereto as Exhibit 1 is a spreadsheet containing a compilation of information provided in Section O of the MDS assessment forms for these 322 patients.

61.     Eastern Shore and Dynamic Rehab engaged in a pattern and practice of compensating for decreased session minutes for one therapy by increasing session minutes for another therapy by a comparable amount. Achieving the 720 minute threshold within the MDS report was the goal regardless of what was appropriate for the patient because the number of minutes of skilled therapy which took place as reported in the MDS assessment determined the per diem reimbursement amount for each patient going forward until the next MDS assessment was submitted to CMS. By way of example, with respect to the four patients identified by the five digit number below, each time the weekly session minutes for physical therapy or occupational therapy decreased from the five-day review to the fourteen-day review, the *other* therapy would rise by a roughly corresponding amount so that in each instance the patient would just meet the Ultra High threshold:

| MRN | Date | RUG | Assessment | Date | OT Mins | Date | PT Mins | Total |
|-----|------|-----|------------|------|---------|------|---------|-------|
| 21154 | 2/17/12 | RU | 5 day | 2/11/12 | 390 | 2/11/12 | 335 | 725 |
| 21154 | 2/24/12 | RU | 14 day | 2/11/12 | 355 | 2/11/12 | 370 | 725 |
| 21154 | 3/9/12 | RV | 30 day | 2/11/12 | 305 | 2/11/12 | 230 | 535 |
| 21154 | 4/5/12 | RM | Discharge | 2/11-4/4/12 | 235 | 2/11-4/4/12 | 250 | 485 |
| 21156 | 2/18/12 | RU | 5 day | 2/13/12 | 375 | 2/13/12 | 350 | 725 |
| 21156 | 2/24/12 | RU | 14 day | 2/13/12 | 385 | 2/13/12 | 340 | 725 |
| 21156 | 3/2/12 | RM | Discharge | 2/13-3/1/12 | 290 | 2/13-3/1/12 | 315 | 605 |
| 21160 | 2/23/12 | RU | 5 day | 2/17/12 | 355 | 2/17/12 | 365 | 720 |
| 21160 | 2/29/12 | RU | 14 day | 2/17/12 | 365 | 2/17/12 | 355 | 720 |
| 21160 | 3/5/12 | RV | Discharge | 2/17-3/5/12 | 310 | 2/17-3/5/12 | 290 | 600 |
| 21167 | 3/2/12 | RU | 5 day | 2/25/12 | 385 | 2/25/12 | 345 | 730 |
| 21167 | 3/9/12 | RU | 14 day | 2/25-3/9/12 | 430 | 2/25-3/9/12 | 300 | 730 |
| 21167 | 3/10/12 | RU | Discharge | 2/25-3/9/12 | 430 | 2/25-3/9/12 | 300 | 730 |

62.     Examination of periodic MDS reports for Medicare Part A patients at Eastern Shore indicates that in multiple cases the type of skilled therapy – speech, occupational or physical – which had ostensibly been prescribed to reflect a patient's particular diagnoses in fact appears to bear no relationship to their medical diagnoses.

63.     Every Friday at 1 p.m. there was a Medicare meeting at which the attendees – including Stabler, Urban, the MDS Coordinator and the Director of Nursing – would discuss each Medicare Part A patient care plan, the amount of Part A coverage remaining, and their current RUG level. During these meetings, Stabler routinely would conclude that every patient needed "about two more weeks" of skilled therapy regardless of the patient's actual progress. During these meetings Stabler appeared to know little or nothing about each patient, however.

64.     Relator Davis once substituted for Stabler at a family care plan meeting. The purpose of these periodic meetings, which social worker Jill Dzuik scheduled, is to discuss patients' progress and discharge plans with their families. However, when Davis explained to the family this purpose, Dzuik immediately corrected her and told her that "discharge" is not a word that needed to be used.

65.     On more than one occasion, if one of the therapists would not administer scheduled therapy because it appeared to be excessive, the Rehab Manager would simply approach another therapist and direct them to administer it. On one occasion Relator Donald administered 45 minutes of occupational therapy to patient "JS". He was slated to receive an additional 180 minutes of physical therapy but Relator Donald recognized that any amount of therapy beyond the 45 minutes JS had already received that day was not indicated and would be of no benefit. When she informed Stabler of this, Stabler ignored it and directed a physical therapist to administer the 180 minutes (three hours) of therapy to capture more minutes.

66.     Sometimes patients slated for five days of therapy would receive six days in a given category in order to achieve the Ultra High level.

67.     At the direction of the Rehab Manager, patients who achieved treatment goals, and thus should have been discharged, continued receiving occupational therapy until their Medicare coverage was exhausted. For instance, on or about August 22, 2012, Relator Donald reported to Stabler that a patient had achieved all his long term and short term goals and had verbally expressed his desire to be discharged. Stabler responded that rather than be discharged, she wanted the patient to remain at Eastern Shore "until insurance cuts him."

68.     Typically, the Medicare Part A patients that were assigned to stay beyond 20 days were those that the facility knew had the financial means to pay for their care – for instance, those with supplemental insurance that would take care of the 20% co-pay. Roughly 80% of the Medicare Part A patients had this supplemental insurance.

69.     All or virtually all Medicare Part A dialysis patients were automatically placed in the Very High category. One exception, patient "H" was on dialysis and placed on Ultra High for

69 days. Oftentimes H was treated six days per week in order to satisfy the 720 minute weekly threshold.

70.     On numerous occasions, Stabler, Urban and/or the admissions director successfully urged Medicare Managed Care patients (for example, "PD" and "GM") to switch their coverage to traditional Medicare Part A so that they could receive "100 days of uninterrupted coverage."

71.     In other instances, Stabler would fraudulently inflate the reported length of a therapy session in order to remain on track to achieve the 720 minute threshold for purposes of the periodic MDS assessment. For example, on November 13, 2012, patient "CH" received 15 minutes of physical therapy and no occupational therapy. Accurate entries were made in his records to reflect this. Three days later, Stabler or someone acting on her behalf altered the entries for that date to fraudulently state that CH received 65 minutes of physical therapy and 50 minutes of OT.

72.     Repeatedly, Eastern Shore and Dynamic Rehab would bill a patient conference as skilled therapy even though the patient was not even present at the meeting. For example, this happened with respect to patient "MG" on or about November 13, 2012 when 30 minutes of therapeutic exercises were fraudulently entered into his treatment records by Stabler.

73.     Stabler would monitor and manage the minutes allotted for therapy each day – if over 720, she would cut it down – if the 720 threshold had not been satisfied, she would have another therapist administer therapy to the patient to achieve it.

74.     When Relator Dinkins interviewed for her position at Eastern Shore with Sandy Faronda, Faronda asked Dinkins about her familiarity with RUG reimbursement rates. She asked how creative Dinkins could be in writing patient goals because "we like to keep patients here as

long as possible." Faronda also told Dinkins that Dinkins would be expected to devote 100% of her time to patients – an impossibility given the other responsibilities outside of administering therapy, such as meetings and paperwork, which therapists must attend to during their workday.

75.     If the patient was at risk of achieving only a Medium level (RM), Stabler would fraudulently endeavor to raise it to a Very High (RV). Stabler sent a handwritten note to Relator Donald on February 8, 2013 through which Stabler sought to pressure Relator Donald into reporting that she provided therapy for 15 minutes on a Friday so that the number of days therapy was administered weekly would be bumped up by a day on the MDS assessment form and an RV level could be achieved: "Meesha, Did you ever get 15 min [with] Walters on Friday 2/7? She was in assessment & has minutes for an RV, but not enough days so she will be an RM unless you got 15 min to count as a day. D.S."

76.     And if a patient was covered by Medicare Part A but became a drain on the facility's finances, they were discharged as quickly as possible. This occurred in the case of patient "WT" who was discharged, even though she was showing improvement in response to therapy, because her prescription drug regimen had become a financial burden.

77.     Financial incentives were in place to induce employees to keep RUG levels high. Stabler handed out gift cards to therapists who administered skilled therapy sessions for the pre-planned number of minutes. Urban and the other Southern SNF facility administrators regularly received bonuses based on achieving RUG level goals as reflected in the results of their facilities' census reports (discussed herein). These amounts were based upon both the number of Medicare Part A patients in their facility and the number of patients at the Ultra High level.

78.     Fraudulent concealment has occurred as well. Therapists were directed not to indicate on the patients' charts when the end of the therapy session took place. Instead, it was

provided directly to Stabler. This was implemented so that if the facility was audited by CMS or Medicare, it would be more difficult for the auditor to detect that such a suspiciously high percentage of patients had been assigned to the Ultra High level.

79.     The Eastern Shore MDS Coordinator, Nicole Speetjens, assigned an ADL designation to each skilled therapy Medicare Part A patient after interviewing them. These designations were routinely inflated to become a "B" or "C" rather than an "A" as part of the facility-wide policy to inflate Medicare Part A reimbursement for skilled therapy.

80.     The average length of stay for Eastern Shores Medicare Part A skilled rehabilitation patients is above the national average as well. The national average is roughly 35 days. In contrast, the length of stay for Eastern Shore patients was seldom less than 35 days and routinely far more.

**C.     Eastern Shore's Approach Towards Skilled Therapy For Its Medicaid And Medicare Part B Patients Was Vastly Different Than For Its Medicare Part A Patients**

81.     Unlike Medicare Part A patients, Medicaid patients at Eastern Shore receiving skilled therapy were viewed as unprofitable "charity cases" and released from the Center as quickly as possible because under the reimbursement methodology for Medicaid patients the per diem reimbursement amount stays constant regardless of whether and how much skilled therapy a patient is receiving. For example, one Medicaid patient entered the Center suffering from brain damage caused by a subdural hematoma. He required skilled rehabilitative therapy. He was released from Eastern Shore as quickly as possible.

82.     Numbers tell the same story. Although Medicaid patients typically comprise approximately 60% of the patient population at Eastern Shore, only a small percentage receive skilled therapy.

83.     Patient "CM" had suffered a severe stroke that adversely impacted her movement and her speech. However, since she was a Medicaid patient, Stabler and Urban directed that she only be seen three days per week and never over 180 minutes per week.

84.     Under Dynamic Rehab's policy, Medicare Part B patients are never assigned a five-day therapy regimen. According to Faronda, the Medicare regulatory framework is such that it is not in the facilities' financial interest to do so.

85.     On or about September 27, 2012, Faronda told Relator Davis that in light of Medicare Part B regulations going into effect as of October 1, 2012, Part B patients should henceforth be discharged before the federal cap on skilled therapy costs was reached. This is because under the new regulations, once the cap was reached, the skilled nursing facility would be responsible for proving to CMS via documentation that the patient's skilled therapy was still medically indicated. Due to this new requirement, Faronda instructed Relator Davis to discharge Medicare Part B patient "EJ".

**D.     Defendants Successfully Achieved Fraudulently Inflated Levels Of Ultra High Therapy At Eastern Shore And Chain-Wide**

86.     Eastern Shore issued periodic "PPS Efficiency Reports." These reports provide the name of each Medicare Part A patient and the number of days each patient had been assigned to the Ultra High RUG level. An Eastern Shore Efficiency Report shows that from January 1, 2012 through March 8, 2013, 6,897 patient days —over 65% of the total 10,514 patient days the Center billed to Medicare Part A during that fourteen-month timespan— were billed at the Ultra High level. Such an extraordinarily high percentage of Ultra High patient days defies explanation unless a fraudulent effort is being undertaken at Eastern Shore to inflate patient RUG levels.

87.     Southern SNF prepared monthly "Census" reports that consolidated into one document the census results that each SNF within its chain had submitted. For each SNF, these

reports identified the number of patient days billed at each of the RUG/ADL levels. Tellingly, the March 2012 report, the relevant portion of which is set forth below, reveals that across all its SNF facilities, not just Eastern Shore, the majority of Southern SNF patients were classified as Ultra High. In fact, the March 2012 percentage of Ultra High patient days billed was even higher than Eastern Shore's at most of the other Southern SNF facilities. Chain-wide, 79% – roughly 4 out of 5 patient days – had been billed at the Ultra High RUG level while virtually none had been billed at the High, Medium or Low levels. A percentage of 80% at the Ultra High level cannot be reconciled with the fact that the Ultra High level is applicable only to "the most complex case requiring rehabilitative therapy well above the average amount of service time" *unless* the Defendants are engaged in fraudulently inflating RUG levels.

| | Advanced | Arbor | Bayside | Courtyards | Eastern | Excel | Gulf Shore | Madison Pointe | North Campus | North Lake | Palmetto | Palms | Parklands | Shore Acres | Southern Oaks | Terraces | Williston | Woodbridge | Totals | Total % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RUX | 0 | 0 | 4 | 23 | 12 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 84 | 0 | 0 | 0 | 41 | 0 | 175 | 1% |
| RUL | 0 | 0 | 29 | 29 | 19 | 12 | 0 | 0 | 8 | 0 | 21 | 0 | 0 | 0 | 15 | 2 | 0 | 0 | 135 | 1% |
| RUC | 117 | 1031 | 81 | 456 | 131 | 191 | 271 | 450 | 292 | 0 | 291 | 239 | 622 | 113 | 101 | 68 | 113 | 55 | 4622 | 30% |
| RUB | 294 | 698 | 218 | 82 | 103 | 950 | 303 | 576 | 444 | 39 | 877 | 186 | 12 | 203 | 66 | 179 | 195 | 121 | 5546 | 36% |
| RUA | 228 | 287 | 129 | 4 | 114 | 68 | 140 | 0 | 101 | 24 | 25 | 121 | 0 | 139 | 94 | 82 | 10 | 188 | 1754 | 11% |
| Total | 716 | 2186 | 579 | 691 | 712 | 1534 | 1291 | 1293 | 1150 | 103 | 1244 | 642 | 766 | 625 | 336 | 332 | 421 | 805 | 15426 | |
| %RU | 89% | 92% | 80% | 86% | 53% | 80% | 56% | 79% | 73% | 61% | 98% | 85% | 94% | 73% | 82% | 100% | 85% | 45% | 79% | |

88.    Southern SNF closely monitored the distribution of its patient days amongst the RUG levels on a daily basis as well. Each morning, Gina Shoub, the Eastern Shore admissions director, was required to update the census report by 8:30 a.m. and forward it to Yaffa Beller at Apex Healthcare, a Southern SNF related company, the precise role of which was never made clear to Relators. Beller, or someone on his behalf, would consolidate all the numbers for each facility and distribute them within Southern SNF and its facilities, generally by 10:30 a.m. that same morning.

89.     Southern SNF facilities periodically provided PPS Overage Reports to Southern SNF management, which management monitored and scrutinized. These reports track the actual minutes of skilled therapy administered to a patient on a weekly basis and compare them to the threshold number of minutes required to achieve the RUG level assigned to that patient – Ultra High (720), Very High (500) and the remaining three levels (to which very few, if any, Medicare Part A patients were ever assigned). Southern SNF's goal is for its SNFs to come as close as possible to that threshold number without going below it. In so during, Southern SNF seeks to maximize efficiency and profitability by ensuring that it achieves the minutes required for that RUG level while simultaneously avoiding providing any minutes beyond what it must in order to get paid. In so doing, however, Defendants are routinely and illegally administering a therapy regimen designed not on the basis of what is indicated in light of the patient's diagnosis and his/her particular physical or cognitive limitations, but on what will generate the most revenue.

90.     Notably, the percentage of Medicare Part A patient days at Eastern Shore and more generally at Southern SNF, that Medicare was reimbursing at the Ultra High rate has been inflated well above current and historical nationwide averages. In the HHS OIG report entitled "Questionable Billing By Skilled Nursing Facilities" issued in late 2010, OIG noted that from 2006 to 2008, the rate of Ultra High therapy rose from 17% to 28%, even though the patient population characteristics remained the same. By 2011, the percentage rate of Ultra Highs had shot up to 44.8% and subsequently to 48.6% by 2012. The rates of Ultra High therapy at Eastern Shore and chain-wide exceed all these percentages, as demonstrated by the percentage figures for March 2012.

**E.      Southern SNF's Unlawful Pattern And Practice Of Inflating RUG Levels Has Resulted In Serious Patient Harm And Death**

91.     The systematic pattern of prescribing and administering a skilled therapy regimen

which fails to reflect a particular patient's needs and at a frequency and for a duration beyond what the patient's physical limitations will allow has resulted in numerous instances of patient harm and in some cases, death. For example, as for the following Eastern Shore Medicare Part A patients:

A.    Patient "IR" was treated at the Ultra High level of skilled therapy and received physical and occupational therapy for the full 100 days of Medicare Part A coverage. However, his body was too frail to tolerate it. He died two days after being released from the Center.

B.    Patient "WL" was brought to the Center with Stage 4 metastatic cancer. He was assigned 14 days of skilled therapy at the Ultra High level and Very High for seven days. The therapy was extremely painful for him and he could not tolerate it. After three weeks at Eastern Shore, he was taken via ambulance to his home. He died en route.

C.    In January of 2012, occupational therapy was administered on patient "E". Relator Dinkins concluded that the patient was too feeble to tolerate the treatment and explained this to Stabler. In response, Stabler directed that the therapy be continued nevertheless. About one week later, the patient died, apparently because the strain on his body was simply too great.

D.    Patient "S" was admitted on or about May 10, 2012 and left on July 3, 2012. He was billed at the Ultra High level during this period but his body could not withstand the strain it placed on him. He was admitted to the hospital shortly thereafter and died within one week of leaving Eastern Shore.

92.    Generally, patients diagnosed with Chronic Obstructive Pulmonary Disease cannot physically tolerate large amounts of physical or occupational therapy. Stabler instructed therapists to administer the therapy anyway to this subset of patients, but to give them extra

breaks. An example of this practice is found with patient "LT". Likewise, patient "CH" was on continuous oxygen and was unable to ambulate long distances. Nevertheless, she received over a month of skilled therapy at the Very High and subsequently the Ultra High level.

93.     Many patients are either too frail or suffer from other physical limitations that prevent them from benefitting from the skilled therapy regimens assigned to them. Others suffer from cognitive deficits such as dementia, which render them incapable of following directions. By way of example:

        A.     In or around September 2012, one patient, "EC," was discharged and went to hospice service at the request of her family due to her distress over, and lack of participation in, the skilled therapy she was receiving. According to Relator Donald's own notes, no matter what the treatment, EC's "constant refrain" throughout the attempted treatment was, "I'll give you $10.00 if you let me go back to bed. I want to go back to my room." And "Please take me back now." EC suffered from dementia and severe pain.

        B.     Patients "OK" and "ET" suffered from severe cognitive deficits but were nevertheless assigned an Ultra High therapy regimen. Patient ET received 51 days of Ultra High therapy but showed no functional gains. Patient "DA" received skilled therapy for over three months but could not follow simple instructions.

**F.     How False Statements And False Claims Were Submitted**

94.     Typically, therapists input the therapy time into the system for each patient after each session. The MDS Coordinator, Nicole Speetjens, then prepared the MDS form. Stabler signed the completed MDS form which was then submitted to CMS. Relators believe that at all relevant times a company called Global transmitted the actual requests for payment on Form CMS 1450 (which reflected and integrated the inflated RUG levels) on behalf of all the Southern

SNF skilled nursing facilities.

**G.    The Departures Of Relators Davis and Dinkins**

95.    The primary reason Megan Dinkins left her employ at Eastern Shore was because she had become pregnant and was concerned that the stress the job created could harm her child. The cause of her job stress was the extreme pressure she felt to provide occupational therapy to every Medicare Part A patient, regardless of whether it was indicated, was reasonable or might cause patient harm.

96.    The day after Relator Davis was terminated on February 20, 2013 she sent an email to Michael Bokor, James Kessler and Sandy Faronda. Therein, she explained the circumstances surrounding her termination and how she had been retaliated against after Stabler unsuccessfully directed her to misrepresent the reason for patient WT's discharge as having been based upon the patient's maximum potential having been reached when, in truth, it had not. In fact, the patient was perceived as a financial burden to the facility and was being discharged for that reason. Relator Davis expressly requested that the circumstances of her termination be investigated as well as "other ethical/unethical practices" taking place at Eastern Shore. Approximately three weeks later she received an email from Moe Mayrant, of Platinum, a company associated with Southern SNF whose precise role vis-a-vis Southern SNF had never been made clear to Relators. He said the "Company" would not change its position as to the termination. The investigation Davis requested of Eastern Shore's unethical practices was not undertaken.

97.    In or around early 2013, Crystal Blackwell, Eastern Shore's director of nursing and risk management, received a packet from a Zone Program Integrity Contractor ("ZPIC") notifying her of an upcoming investigation of Eastern Shore to detect any possible fraud, waste

or abuse. ZPICs are private contractors hired and overseen by CMS.

**H.   Additional Scienter Allegations: Defendants Knew That They Were Billing Medicare And Tricare For Medically Unreasonable, Non-Beneficial And Unnecessary Services**

98.   Defendants knew that Medicare and TRICARE only paid for skilled rehabilitative therapy services that were reasonable and necessary, consistent with the nature and severity of the patient's illness or injury, the patient's particular medical needs, and accepted standards of medical practices.

99.   Defendants' violations of the applicable requirements for Medicare and Tricare reimbursement were so blatant and widespread that even a general awareness of these requirements would have put a reasonable person on notice that Defendants were submitting false claims for payment.

100.   Since at least September 2008, the provision of medically unnecessary rehabilitation therapy has been an area of concern identified by the HHS Office of Inspector General ("HHS-OIG").

101.   In September 2008, the HHS-OIG published supplemental guidance to skilled nursing facilities that identified therapy services and in particular the "improper utilization of therapy services to inflate the severity of RUG classifications and obtain additional reimbursement" as a fraud and abuse risk area. OIG Supplemental Compliance Program Guidance for Nursing Homes, 73 Fed. Reg. 56832, 56840 (Sep. 30, 2008).

102.   As the HHS-OIG further noted: "Unnecessary therapy services may place frail but otherwise functioning residents at risk for physical injury, such as muscle fatigue and broken bones, and may obscure a resident's true condition, leading to inadequate care plans and inaccurate RUG classification." *Id.*

103.    HHS-OIG "strongly advise[d] nursing facilities to develop policies, procedures, and measures to ensure that residents are receiving medically appropriate therapy services." *Id*.

104.    In November 2012, the HHS-OIG released an analysis of payments to skilled nursing facilities during 2009 and concluded that 25% of all claims in 2009 were in error. The majority of these claims in error involved up-coding and "many of these [up-coded] claims were for ultrahigh therapy."

## COUNT I:  FALSE OR FRAUDULENT CLAIMS
### (31 U.S.C. § 3729(a)(1)(A))

105.    Relators repeat and re-allege paragraphs 1-104 as if fully set forth herein.

106.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment to Medicare and TRICARE for medically unreasonable, unnecessary and unskilled rehabilitation therapy as reflected in forms CMS-1450.

107.    Because of Defendants' acts, the United States sustained damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## COUNT II:  FALSE STATEMENTS
### (31 U.S.C. § 3729(a)(1)(B))

108.    Relators repeat and re-allege paragraphs 1-104 as if fully set forth herein.

109.    Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), including false Minimum Data Sets.

110.    Because of Defendants' acts, the United States sustained damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act, plus

civil penalties of not less than $5,500 and up to $11,000 for each violation.

WHEREFORE, Relators respectfully request that this Honorable Court enter judgment in their favor and in favor of the United States of America and against Defendants as follows:

A.   For treble damages and civil penalties of not less than $5,500 nor more than $11,000 per false claim pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*;

B.   For pre-judgment interest on all damages awarded;

C.   For any and all reasonable costs and attorneys' fees;

D.   For an award to Relators in the maximum amount permissible pursuant to 31 U.S.C. § 3730(d); and

E.   For such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.


DATED: July 30, 2013                    COHEN MILSTEIN SELLERS & TOLL, PLLC


                                         /s/ Jeanne A. Markey
                                        Jeanne A. Markey
                                        Gary L. Azorsky
                                        Casey M. Preston
                                        1717 Arch Street, Ste. 3610
                                        Philadelphia, PA 19103
                                        (267) 479-5700
                                        Fax (267) 479-5701
                                        jmarkey@cohenmilstein.com
                                        gazorsky@cohenmilstein.com
                                        cpreston@cohenmilstein.com

Sarah Hubbard
THE HUBBARD LAW FIRM
555 Henry St., Ste. 1
Brooklyn, NY  11231-2889
(917) 902-3606
Fax (718) 233-4193
hubbard@hubbardpc.com

Samuel A. Cherry, Jr. (ASB-4006-H56S)
THE COCHRAN FIRM
2561 Dauphin Street
Mobile, AL  36606
(251) 434-9992
Fax (251) 434-9995
SamCherry@CochranFirm.com

*Attorneys for Relators*